**E-Filed 03/26/2008**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KATHY SULLIVAN,<br><br>    Plaintiff,<br><br>v.<br><br>AETNA LIFE INSURANCE COMPANY, APPLE COMPUTER, INC., LONG TERM DISABILITY PLAN,<br><br>    Defendants. | Case Number C 06-01994<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL ON ADMINISTRATIVE RECORD[1]<br><br>[re: docket no. 15] |

    Plaintiff Kathy Sullivan ("Sullivan"), a sixty-three year old woman, brings this action under 29 U.S.C. § 1132(a)(1)(B) seeking benefits under the Apple Computer, Inc. Long Term Disability Plan ("LTD Plan"), which is insured by Defendant Aetna Life Insurance Company ("Aetna"). The Court conducted a bench trial on the administrative record, consisting of a review of the parties' briefing and of the administrative record, and consideration of oral arguments presented on April 20, 2007. For the reasons discussed below, judgment will be entered in favor

---

[1] This disposition is not designated for publication and may not be cited.

Case No. C06-01994
FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL ON ADMINISTRATIVE RECORD
(JFEX2)

of Sullivan.

## I. BACKGROUND

Sullivan began working for Apple Computer, Inc. ("Apple") in September 1984 as a training specialist, and by 1990 she was managing a staff of eight and was responsible for a wide range of customer training activities. As an Apple employee, Sullivan enrolled in an LTD coverage plan under a group policy issued by Aetna. In July 1992, Sullivan made a claim for disability benefits based on fibromyalgia and TMJ syndrome. Her last active day of work was July 31, 1992. At that time, she earned an annual salary of $83,640.45.

Apple approved the claim and paid one year of disability benefits under Apple's Voluntary Disability Benefit plan. Apple thereafter referred Sullivan's claim to Aetna for evaluation of benefits under the LTD plan. Aetna approved Sullivan's claim for LTD benefits on October 19, 1993 and paid LTD disability benefits for more than ten years thereafter. During that ten-year period, Aetna frequently requested and received Attending Physician's Statements and other documentation of Sullivan's disability. The medical records from this ten-year period reflect a diagnosis of fibromyalgia with associated pain, fatigue and cognitive impairments. "Fibromyalgia is a type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression." *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794, 796 (9th Cir. 1997). In February 1996, the Social Security Administration found Sullivan to be totally disabled as of July 31, 1992 based upon findings that she suffered from severe chronic fatigue and depression.

On December 17, 2003, Aetna sent Sullivan a letter stating that she no longer qualified for LTD benefits under the plan. The letter noted that during the first twenty-four months of claimed disability, a plan participant is disabled if she cannot perform her "own occupation," and that thereafter a plan participant is disabled if she cannot perform "any reasonable occupation." The letter went on to define "reasonable occupation" as: "any gainful activity for which you are

2

or may reasonably become fitted by education, training, or experience." The letter also noted that a period of total disability will end after twenty-four months if it is determined that the disability is not caused by a physical impairment, meaning it cannot be demonstrated by clinical and laboratory diagnosis. For example, according to the letter, a mental or nervous condition is not a physical impairment.

The letter then referenced certain of Sullivan's medical records, including the following: a July 19, 2003 evaluation by Dr. Lock finding that all testing was within normal limits, reporting that Sullivan walked two miles per day, and recommending that Sullivan return for further work-up only if her symptoms worsened; a functional capacity evaluation ("FCE") performed by a physical therapist at Aetna's request on August 5 and 6, 2003, indicating that Sullivan could work in the "light" category and that she was malingering; a neuropsychological Independent Medical Evaluation ("IME") performed by Dr. Karzmark at Aetna's request indicating that Sullivan's test performance indicated someone in the borderline range in terms of employability but stating that "[a]lthough there was no clear indication for malingering, I would say that symptom magnification was present in her neuropsychological test results." Aetna's letter also stated that during professional surveillance of Sullivan's activities, she had been observed to walk, stand, drive, bend, lift and carry a large box, and use a garden hose. Aetna's letter stated that three of its medical consultants, Drs. DeFoy and Schroeder and Nurse Mazza, had concluded that Sullivan's claimed total disability was not supported by the medical evidence and that Sullivan appeared to be malingering. Finally, Aetna stated that its vocational consultant had determined that Sullivan could perform several occupations, including Manager Data Processing, Information Scientist, Manager, Computer Operations, Branch Manager and Department Manager.

Sullivan appealed the termination of LTD benefits and submitted additional documentation in support of her appeal on August 4 and 16, 2004. Aetna denied the appeal in a letter dated July 13, 2005. The letter noted that Sullivan had submitted additional information on appeal, including a report from Dr. Carteron dated March 8, 2005, comprised of notes and test

1 results, letters from Drs. Gavin, Moses and Bastien, and statements from Sullivan and her
2 husband.  The letter went on to state that Sullivan's stress tests in 1999 and 2002 were
3 inconsistent with total incapacity, as were Sullivan's self-reported daily activities, which included
4 walking, laundry, dusting, vacuuming, washing dishes, crafts, sewing, computer work, watching
5 television and visiting friends and relatives.  The letter noted an absence of clinical findings to
6 support Sullivan's subjective pain complaints, pointing for example to the fact that Dr. Gavin's
7 February 2003 examination did not include any findings of neuromuscular abnormalities or
8 tender points and that the record did not contain any MRI scans of Sullivan's cervical, thoracic or
9 lumbar spine, any sleep studies or any notes from pain management or myofascial release
10 treatments.  The letter also suggested that Sullivan was feigning or embellishing her limitations.
11 The letter concluded by finding that the termination of benefits was appropriate.

## II.  LEGAL STANDARD

13     The parties agree that the de novo standard of review is appropriate. Under the de novo
14 standard of review, this Court "must determine whether Plaintiff is disabled within the terms of
15 the policy." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).  Unless " there
16 are genuine issues of material fact in dispute," the Court "may decide the case by summary
17 judgment." *Id.*  If issues of material fact preclude summary judgment, the Court must conduct a
18 bench trial on the administrative record and such other evidence as the Court admits. *Kearney*,
19 175 F. 3d at 1094-95.  Under a de novo standard of review "Plaintiff must carry the burden to
20 prove that she was disabled under the meaning of the plan and Defendants must carry the burden
21 of proving the applicability of any plan coverage exclusion they seek to invoke." *Sabatino v.*
22 *Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal., 2003).

## III.  DISCUSSION

24 **A.     Proof of Disability**

25     Aetna's LTD policy states that a claimant must prove an inability "solely because of
26 injury or disease, to work at any reasonable occupation." (AR 00023).  As a result, Sullivan must
27 provide sufficient evidence of the existence of injury or disease.  While the parties do not dispute

28

4

that Sullivan suffers from fibromyalgia and chronic fatigue syndrome ("CFS"), they dispute the definition of "diagnosis" and whether Sullivan has met that definition. Sullivan points out that in Aetna's original and appeal denial letters, Aetna appears to view "diagnosis" as meaning the process of identifying a disease by its signs and symptoms. (AR 00738-45, AR 00034-37). Sullivan contends that she has met this burden. However, in its opening trial brief, Aetna contends that Sullivan must demonstrate the existence of the injury or disease through clinical and laboratory diagnosis. Aetna points to the following policy language:

> Also, a period of total disability will end at any time after the first 24 months if it is determined that it is not at that time caused by a physical impairment. (This means that it cannot be demonstrated by clinical and laboratory diagnosis. A mental or nervous condition, for example, is not a physical impairment.

(AR 00024). Aetna contends that Sullivan has failed to provide clinical and laboratory diagnosis. After reviewing the medical and vocational evidence in the record as a whole, and for the reasons set forth below, the Court concludes that, under either definition of "diagnosis," Sullivan has provided sufficient evidence of her inability to work at any reasonable occupation.

Using Sullivan's definition, it is clear that Sullivan has provided sufficient evidence indicating her medical diagnosis. The Administrative Record shows that, on or about April 1991, Sullivan began treating with Dr. Thomas. (AR 01922). In March 1992, on referral from Dr. Thomas, an MRI of Sullivan's brain was performed. The MRI "showed a few T2 lesions in the basal ganglia, subcortical white matter of the left parieto-occipital region." (AR 00129).

On or about July 31, 1992, Sullivan became disabled, as documented on Apple's Voluntary Disability Benefit Claim Form. (AR 01922). Dr. Thomas's diagnoses on the form were moderately severe fibromyalgia and TMJ Syndrome. *Id.* On referral, Dr. Lawry, a rheumatologist, strongly agreed with Dr. Thomas's impression of fibromyalgia based on "significant posterior occipital head pain and neck pain, medial and infrascapular discomfort plus fatigue and a.m. soreness with striking tender points on examination." (AR 1930-32). On or about October 1992, Sullivan consulted with Dr. Green, who reviewed the history of the development of the disability and indicated that Sullivan began to notice cognitive decline in 1987 or 1988, that her most severe problem was neck and head pain, and that she had been

5

diagnosed with fibromyalgia. (AR 01950-51).

In a letter dated April 20, 1994, six months after Aetna approved Sullivan's LTD claim, Dr. Linden provided a diagnosis of CFS and noted problems of inability to concentrate, forgetfulness, and confusion. On February 20, 1996, Carmen Citron, Administrative Law Judge for the Social Security Administration ("SSA"), found that Sullivan had been disabled since July 31, 1992, based on the finding that "the medical evidence establishes that the Claimant's combination of impairments prevent her from performing the full range of sedentary work." (AR 01696-98). While the findings of the SSA are not binding on this Court, *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), there is no authority suggesting that the Court may not, in its discretion, consider these findings. The foregoing evidence is undisputed and shows sufficient diagnosis, when diagnosis is understood as the process of identifying a disease by its signs and symptoms.

In addition to her initial diagnoses, Sullivan continued to present clinical evidence of her physical impairments. In 1997, Sullivan's primary treating physician, Dr. Trujillo, noted limitations of difficulty with memory and sleeping 10-14 hours per day. (AR 01689-89A). In 1998, Dr. Trujillo noted that Sullivan was able to sit only 30-45 minutes and that her cognitive impairment limited her concentration. (AR 01463). On October 2, 2000, Dr. Trujillo completed a Physical Capacities Evaluation form and medical chart. The form noted that Sullivan "continues to have chronic fatigue/fibromyalgia and continues to be fully disabled." (AR 01424). The chart included limitations of sitting, standing, or walking no more than one half hour at a time, and no more than one hour out of an eight hour day. (AR 01550).

On March 7, 2001, Dr. Gavin, Sullivan's primary treating physician at the time, indicated CFS with worsening stiffness and weakness in Sullivan's extremities, especially her hands. (AR 01195). In February 2003, Dr. Gavin prepared an Attending Physicians Statement and Functional Capacity Worksheet (AR 00861-59), in which she stated: "Due to chronic multiple conditions, [the] pt. [is] unable to cognitively perform duties of a job on [a] consistent [and] reliable basis. [Her] [s]ymptoms [and] mental capacity vary greatly from day to day." (AR

00859).

Even clinical evaluations performed by Aetna's own specialists support Sullivan's inability to work. On or about June 2003, Aetna's Medical Director, Dr. DeFoy found that surveillance did not necessarily establish work capacity. (AR 00700). On August 25, 2003, Sullivan underwent a neuropsychological evaluation by Dr. Karzmark, who noted complaints of pain and fatigue and slow responding performance throughout testing. (AR 00732). Nevertheless, in a letter dated December 17, 2003, Aetna denied Sullivan benefits. (AR 00738-45).

On Sullivan's appeal from her denial of benefits, Dr. Moses evaluated her further. Dr. Moses' testing identified a number of deficits, and Dr. Moses stated that Sullivan "would have very great difficulty performing adequately in a competitive employment setting in which speed and efficiency of performance are important features of effective job performance." (AR 00194). He concluded that "she would not be able to effectively problem solve in any sort of executive problem solving role where the ability to weigh, evaluate, and choose among alternatives is a consistent feature of effective job performance." (AR 00195).

Dr. Moses referred Sullivan to Dr. Bastien to assess more accurately Sullivan's vocational potential. Dr. Bastien's testing showed that none of Sullivan's aptitude scores even approached the minimum levels necessary for her to function at any of the occupations suggested by Aetna. (AR 00201). Dr. Bastien went so far as to say that "[s]he couldn't even do the most menial jobs." *Id.*

On September 10, 2004, after Aetna's receipt of these reports, Aetna had an in-house medical review performed by Dr. Schmidt, a rheumatologist. (AR 00046-51). While accepting the diagnosis of fibromyalgia and chronic fatigue syndrome, Dr. Schmidt asserted that Sullivan's "file lacks sufficient medical to support objective evidence of a physical functional capacity impairment." (AR 00049). In response, Sullivan submitted an independent rheumatology consultation from Dr. Carteron. (AR 00127-30). Dr. Carteron opined that Sullivan was unable to return to gainful employment because of her symptoms of fibromyalgia and her neurocognitive

7

dysfunction. (AR 00130). Dr. Schmidt's response to the letter was that his opinion had not changed. (AR 00051).

Aetna then referred the file to Dr. Attfield, who criticized Dr. Moses' report but failed to indicate that he reviewed Dr. Carteron's report. He suggested an impartial, forensic neuropsychological assessment in response to a request for clarification from an Aetna claims adjuster. (AR 00301). However, Aetna conducted no such evaluation and issued its final denial on July 13, 2005. (AR 00034-37).

Despite this overwhelming evidence, Aetna denied Sullivan's claim based on its assertion that there is no clinical and laboratory diagnosis to support the extent of Sullivan's pain and cognitive impairments and her inability to work. Specifically, Aetna stated that the lack of MRI scan reports, pain management reports, sleep studies, or myofascial release treatments support its determination that Sullivan's medical file did not provide a clinical or laboratory diagnosis of a disability. (AR 00035).

Aetna further asserts that Sullivan is not disabled from "any occupation." Aetna's plan requires Sullivan to find a "reasonable occupation," which is defined as "any gainful activity for which you are, or may become, fitted by education, training, or experience." (AR 00023). It states that the Administrative Record contains sufficient evidence of Sullivan's capacity to work under the "any occupation" standard. Aetna conducted a Transferable Skills Analysis ("TSA") to show that Sullivan is qualified to perform some occupations and also conducted a Labor Market Survey ("LMS") to locate potential job opportunities in Sullivan's vicinity. The LMS identified five occupations meeting the gainful requirement: Manager, Data Processing; Information Scientist; Manager, Computer Operations; Manager, Branch; and Manager, Department. (AR 00751-57).

These reports, however, do not show the existence of a gainful occupation for which Sullivan is qualified, based on her limitations. For example, Dr. Gavin's FCE found that Sullivan should limit her computer use to ten minutes and restricts her sitting and standing to thirty minutes. (AR 00783). It is evident that the TSA was performed without consideration of

8

Sullivan's limitations. Furthermore, the LMS cover page notes that the survey was performed on the basis that "no medical history or physical restrictions were provided." (AR 00751).

Moreover, Aetna relies in large part on subjective criteria to determine that Sullivan is able to work, despite its insistence that Sullivan provide objective criteria to support her disability. Aetna states that Sullivan reported being able to care for herself and that she mentioned that she walked, did some housework, watched television 3-4 hours daily, and visited friends or relatives weekly. (AR 01280-89). Sullivan also reported driving and paying the bills using the computer. *Id.* Aetna also relies on a subjective analysis of Sullivan's decision to move from an apartment into a house, which, Aetna claims, is indicative of additional capability to care for and handle the stress of home ownership. Finally, Aetna asserts that Sullivan is simply feigning her impairment. Aetna's evidence in support of this theory is exceedingly sparse, particularly over the extent of the clinical record.

Despite Aetna's contentions, the foregoing evidence is sufficient to support Sullivan's claim that she is physically incapable of performing "any reasonable occupation" even under Aetna's stricter definition of "diagnosis." Sullivan has met her burden of proving that she is totally disabled from any reasonable occupation by the symptoms of fybromyalgia and CFS.

### B. Augmentation of the Administrative Record

Sullivan requests that the Court consider evidence outside the Administrative Record in deciding whether she is entitled to LTD benefits. While acknowledging that "the record that was before the administrator furnishes the primary basis for review," *Kearney v. Standard Ins. Co.*, 175 F.d 1084, 1090 (9th Cir. 1999), she cites Ninth Circuit law holding "that new evidence may be considered under certain circumstances to enable the full exercise of informed and independent judgment" even if "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995).

In line with *Mongeluzo*, which states that new evidence is only admissible when the Plan

Administrator fails to follow procedural requirements, 43 F.3d at 943-44, Sullivan argues that she was denied a full and fair review under 29 U.S.C. § 1133(2). However, given the Court's findings of fact and conclusions of law in favor of Sullivan, the issue of whether it is appropriate to admit additional evidence is moot.

## IV.  DISPOSITION

Good cause therefore appearing, IT IS HEREBY ORDERED that Sullivan's future LTD benefits be reinstated, that she be awarded retroactive disability benefits owed since Aetna's December 17, 2003 denial, at a rate of $3,777.02 per month, plus interest according 29 U.S.C. §1961, and that all other benefits under the Plan be reinstated, including Sullivan's life insurance in the amount of $502,000.00.  Judgment shall be entered accordingly.

IT IS SO ORDERED.

DATED: March 26, 2008

                                              JEREMY FOGEL
                                              United States District Judge

Case No. C 06-01994
FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL ON ADMINISTRATIVE RECORD
(JFEX2)

This Order has been served upon the following persons:

Counsel for Plaintiff:

Charles Balch Perkins
Flynn Rose & Perkins
cbperk@earthlink.net


Counsel for Defendant:

Ronald K. Alberts
Gordon & Rees LLP
ralberts@gordonrees.com

Lisa K. Garner
Gordon & Rees LLP
lgarner@gordonrees.com

11

Case No. C 06-01994
FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL ON ADMINISTRATIVE RECORD
(JFEX2)